IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Chief Judge

Civil Case No. 06-cv-00663-LTB-CBS

HARTSHORN PROPERTIES, LLC, a Colorado limited liability company,

    Plaintiff,

v.

BNSF RAILWAY COMPANY, a Delaware corporation,

    Defendant.

_____

FINDINGS OF FACT AND CONCLUSIONS OF LAW
_____

After a bench trial on November 16, 2006 on the consolidated injunctive and declaratory phases of this action, the plaintiff, Hartshorn Properties, LLC ("Hartshorn"), and the defendant, BNSF Railway Company ("BNSF"), submitted the matter to me with proposed findings and conclusions. I have reviewed the evidence adduced at trial, the deposition testimony designated by the parties, and the parties' written submissions. I now find and conclude the following.

**I. Issues presented**

At issue is a 1903 deed by which Hartshorn's predecessor in interest, a farmer, conveyed to the Fort Collins Development Railway Company, BNSF's predecessor in interest, a strip of land, bisecting the farm, on which to construct a rail right of way. In the deed, the railroad agreed "to put in all the crossings that are necessary for use on said farm and to construct and maintain suitable gates at said crossings." The parties dispute the extent of this reservation. BNSF argues that the crossings, which it has removed, are reserved for agricultural uses only. Hartshorn

disagrees and asks that the crossings be restored.  The parties agree that I have jurisdiction over this dispute pursuant to 28 U.S.C. § 1332.

BNSF offers four additional arguments against Hartshorn's request for declaratory and injunctive relief.  First, it agues that the reservation for the crossings was in gross and not appurtenant to Hartshorn's land.  Second, it argues that the crossings are no longer necessary.  Third, it asserts that it had a privilege to remove the crossings.  Finally, it contends that Hartshorn forfeited the crossings.

## II.  Legal standards

The central question is what the parties to the 1903 deed intended by the phrase "all the crossings that are necessary for use on said farm."  *Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1235 (Colo. 1998); Restatement (Third) of Property (Servitudes) § 4.1 (2000).  The language is to be "interpreted to accord with the meaning an ordinary purchaser would ascribe to it in the context of the parcels of land involved."  *Lazy Dog Ranch*, 965 P.2d at 1237.

Colorado has adopted the Restatement approach to determining the extent of an easement.  The First Restatement identified four factors to consider: "(a) the circumstances under which the conveyance was made, (b) the fact that the conveyance was or was not gratuitous, (c) the use made of the servient tenement before the conveyance, (d) the use made of the servient tenement after the conveyance."  Restatement (First) of Property § 483 (1944).  Quoting from the recently-released Third Restatement, the *Lazy Dog* court stated,

> Circumstances relevant to interpreting the language of a servitude include the location and character of the properties burdened and benefitted by the servitude, the use made of the properties before and after creation of the servitude, the character of the surrounding area, the existence and contours of any general plan of development for the area, and consideration paid for the servitude.

*Lazy Dog Ranch*, 965 P.2d at 1237.

The original Restatement allowed some elasticity in the scope of an easement. However, this flexibility is not infinite.

> In ascertaining, in the case of an easement appurtenant created by conveyance, whether additional or different uses of the servient tenement required by changes in the character of the use of the dominant tenement are permitted, the interpreter is warranted in assuming that the parties to the conveyance contemplated a normal development of the use of the dominant tenement.

Restatement Property § 484 (1944).

Similarly, the Third Restatement contemplates that the "manner, frequency, and intensity of the use" of an easement "may change over time to take advantage of developments in technology and to accommodate normal development of the dominant estate or enterprise benefitted by the servitude." Restatement (Third) of Property (Servitudes) § 4.10 (2000). However, this evolution is expressly confined within the terms of the servitude defined by "the intention of the parties ascertained from the language used in the instrument, or the circumstances surrounding creation of the servitude... ." *Id*. at §§ 4.1, 4.10. As these authorities make clear, the inquiry turns on the questions what the parties to the 1903 deed intended by the language they employed and what they contemplated as normal uses of the dominant tenement.

### III. Findings

#### A.    History of the land

By the 1903 deed, J. H. Morrison conveyed to the Fort Collins Development Railway Company "a strip of land fifty (50) feet wide" running from southwest to northeast across Morrison's farm, dividing the 150-acre tract and leaving approximately 50 acres secluded

northwest of the tracks.  The deed includes the following language, central to this dispute.

> [The Fort Collins Development Railway Company] as a further consideration agrees to deliver all water across said right of way in ditches as now constructed and used for irrigation of said land, and also agree (sic) to put in all the crossings that are necessary for use on said farm and to construct and maintain suitable gates at said crossings.

Morrison conveyed the trackage way "with the appurtenances, unto [the Fort Collins Development Railway Company], its successors, heirs and assigns forever" and warranted that he conveyed the land in fee simple, free of encumbrances.

In the period directly after the conclusion of World War II, either 1948 or 1949, Duane Hartshorn obtained Morrison's farm.  Duane, his son Denzel Hartshorn, Denzel's sister, and their agents farmed the land until 1999.  During this time, two wood-plank crossings intersected the tracks, providing access from the 100-acre parcel southeast of the tracks to the 50-acre parcel northwest of the tracks.  (A third crossing passed over the tracks southwest of these, but, because of an intervening canal, did not, and does not, adjoin the northwest parcel.)  The Hartshorns farmed both properties, growing crops and grazing cattle on the northwest parcel, which they accessed infrequently in the winter and intermittently, sometimes multiple times per day, the rest of the year.

The Hartshorns' neighbors also farmed.  Aerial photographs of the area taken in 1974, 1981, and 1987 show agricultural use of the properties surrounding the Hartshorn parcels. Denzel Hartshorn testified that a neighbor farmed the Hartshorns' land for them for several years during the 1970's.  Farms continued to encircle the Hartshorns' land until, in a recent year, Kenneth Crumb and his partners bought the tract of land immediately east and convinced the nearby City of Fort Collins to annex it.  Through an entity called Waterglen, LLC, Mr. Crumb

developed and sold 500 home sites on this easterly neighbor of the Hartshorns. Parcels to the north, west, south, northwest, northeast, and southwest of the Hartshorns' land continue to this day to demonstrate indicia of agricultural use.

In 1999, the Hartshorns sold both of their parcels to Waterglen. Waterglen, in turn, sold the properties to Hartshorn, a limited liability company not connected with the Hartshorn family, of which Mr. Crumb is the managing partner. Hartshorn sold the southeast parcel to Trail Head, Inc., of which Mr. Crumb and his partners are shareholders. Trail Head then developed residential housing on the southeast parcel, except for a ten-acre strip between the tracks and a canal that runs parallel to the tracks, just southeast of them. Hartshorn continues to own the parcel northwest of the tracks.

While producing the Trail Head development, Mr. Crumb and his agents moved 450,000 cubic yards of dirt from Hartshorn's parcel, northwest of the tracks, to the Trail Head parcel, southeast. Also, Hartshorn sold 100,000 cubic yards of dirt, taken from the northwest parcel, to another developer. Though Hartshorn replaced the topsoil after removing the dirt, the excavations lowered the profile of the northwest parcel appreciably.

### B.     The dispute over the crossings

Recently, the federal government recommended to railroads that they eradicate twenty-five percent of their track crossings. Mindful of this recommendation, and in the interest of safety, BNSF resolved to close 420 crossings per year for ten years. In September or October of 2003, Steve Patterson, a BNSF representative responsible for identifying candidates for closure, and an emphatic but credible witness at trial, happened upon Hartshorn's crossings. Observing fallow fields on both sides of the tracks and weeds growing in the approaches to the crossings,

5

Mr. Patterson concluded that the crossings were not then in use. He communicated this belief to his immediate supervisor, Steven Neubauer, and to Mr. Neubauer's supervisor, Robert Roy. He later accessed Trail Head's property in his automobile by following a road along the canal. He assumed that this road provided alternative access to Hartshorn's parcel northwest of the tracks, but did not undertake to investigate whether the road communicates with the northwest parcel. (It does not.) He did not investigate whether Hartshorn has alternative legal access to its parcel.

In January, 2004, Mr. Patterson called Mr. Crumb. Accounts of this conversation diverge. Mr. Patterson asserts that he stated his intention to remove both crossings, that Mr. Crumb asked for a reprieve and proposed the retention of one crossing while Mr. Crumb moved dirt across the tracks, and that he told Mr. Crumb he would temporarily leave one crossing nearest to the location where Mr. Crumb bridged the nearby canal. Mr. Patterson then told Mr. Roy that Mr. Crumb was willing to forfeit one crossing and that BNSF could remove both crossings once the excavation work was completed. He testified that "it was always implied and understood" that BNSF would eventually remove both crossings, but conceded that Mr. Crumb never explicitly agreed to this understanding. He assumed, but never asked, that Mr. Crumb would have no need of the crossings after the excavation was performed.

Mr. Crumb, whose memory of the conversation proved less certain, stated on direct examination that Mr. Patterson never suggested that BNSF intended to remove both crossings. However, on cross examination, Mr. Crumb testified that Mr. Patterson had declared his intention to remove one "or more" of the two crossings. He asserts that he wanted BNSF to upgrade one of the crossings to enable access for heavy equipment and thus suggested to Mr. Patterson a compromise: BNSF could take one crossing in exchange for the installation of concrete in the

other crossing. However, the parties never reached agreement on these terms.

On March, 11, 2004, Hartshorn's attorney, Michael Maxwell, wrote to an agent of BNSF responsible for collecting crossing applications, asking that BNSF upgrade one of the plank crossings to a concrete crossing more suitable to the carriage of earth-moving equipment. He included in his correspondence a copy of the 1903 deed and a completed BNSF form "Application for Private Crossing." The form proposed a temporary – five years – use of the crossing to "[m]ove dirt to level farmsite." It identified Hartshorn's future plans for the property as "[p]artially undeveloped farm land, partially developed as residential." BNSF never approved the application. Instead, its agent wrote to Mr. Maxwell opining that use of the crossings was reserved "for farm/agricultural purposes" and that "[i]n the event Mr. Crumb desires to use the Crossing for any other purpose, he must submit an application for such use for review by BNSF."

In April, 2005, Hartshorn pressed on with its earth-moving operation, without the approval of BNSF. BNSF agreed not to pursue the matter until Mr. Crumb finished his excavation. In the fall of 2005, Mr. Crumb informed BNSF that he was not finished moving dirt and that he intended to continue the project for one month more. Neither Mr. Patterson nor any other BNSF representative contacted Mr. Crumb thereafter.

### C. Negotiations with the City

Mr. Crumb, cognizant that the City of Fort Collins had difficulty managing its storm water, proposed a sale to the City of 40 acres northwest of the tracks, on which to construct a storm water retention pond. The City initially responded to this idea with disinterest, but inquired about obtaining the other 10 acres of the northwest parcel for the establishment of affordable housing. After some initial consideration, the City cooled to the notion of building housing –

because of its policies of minimizing at-grade railroad crossings and requiring two points of emergency ingress to each neighborhood, the City would have to purchase alternative access to the parcel – and warmed to the retention pond plan.  In late 2003 or early 2004, representatives of the City drafted an option agreement for the purchase of 40 acres of the northwest parcel.  However, the City and Hartshorn never reached a final agreement for two reasons.  First, the project requires the replacement of 10,000 cubic yards of the dirt that Trail Head removed from the property.  Second, the City was concerned that it might not have legal access to the northwest parcel.

Mr. Crumb claims to have informed Mr. Patterson in February, 2004 of his plan to build a detention pond on the northwest parcel.  Mr. Patterson denies this.

In order to consummate the deal with the City, Hartshorn undertook to move some dirt back across the tracks from the Trail Head property to the northwest parcel.  However, on February 1, 2006, BNSF removed both crossings, thwarting Hartshorn's plan.  Mr. Roy, who made the decision to close the crossings, believed the crossings were no longer in service, that Hartshorn had alternative access to the northwest parcel, that the crossings were redundant, and that Hartshorn's use of the crossings exceeded their legal scope.  In reaching this determination, he relied upon information that Mr. Patterson and BNSF's legal department provided; he did not perform an independent investigation or visit the site.  He allowed that some confusion persisted within BNSF concerning what the 1903 deed permitted.

Primary in Mr. Roy's mind was safety along BNSF's tracks.  He was primarily concerned with the vehicular approach to the crossing farthest from the canal, which was steep, adjacent to a sharp curve, and provided little visibility along the tracks.  He was also mindful that Mr. Crumb's

nearby developments contained 500 and 350 homes, respectively. This concerned Messrs. Roy and Patterson because railroads are attractive to children and pedestrian traffic on the crossings from the nearby homes could prove fatal.

### D.     Current use of the northwest parcel

Throughout the development of the Trail Head property and the negotiations with the City, Hartshorn continued to farm the northwest parcel (and the strip of land between the tracks and the canal to the southeast) for tax purposes; the tax basis for agricultural property is lower than the basis for property put to higher uses. Hartshorn grew alfalfa, a perennial, on the land and engaged contractors to cultivate and harvest the crop, which produced three or four cuttings per year. Since BNSF removed the crossings, Hartshorn has permitted a neighboring farmer, with access to the property, to harvest the alfalfa.

## IV.  Conclusions of law

### A.     The scope of the 1903 easement conveyance

As I determined when resolving the parties' cross motions for summary judgment, the phrase "all the crossings that are necessary for use on said farm" is ambiguous. Specifically, it is not apparent on the face of the instrument whether the word "farm" is merely a noun or whether it is intended also to modify the word "use."

Unfortunately, the trial was most notable for the lack of light the evidence cast upon this central issue. *Contrast*, *generally*, *Lobato v. Taylor*, 71 P.3d 938 (Colo. 2002). As explained above, my task is to interpret the 1903 deed in light of what the parties to the conveyance understood at that time. The parties do not dispute that the property was farmed before 1903 and continued to serve agricultural ends until 1999. I infer from the photographic evidence and some

9

express testimony that most, if not all, of the surrounding land was farmed at the time of the 1903 conveyance and for many years thereafter; at least three neighboring tracts appear, from aerial photographs, to be farmed to this day. The northwest parcel has not been annexed into the City of Fort Collins but remains within Larimer County. It is zoned for agriculture.

There the fertile flow abates. I am given no direct evidence concerning what, if any, residential development the parties might have contemplated in 1903. Nothing appeared concerning the proximity of the farm to the residential portion of Fort Collins at the time of the easement's creation, the rate of the town's growth, the prevalence of non-agrarian industries, or the incidence, if any, of conversion of farm land into dwellings.

The language of the 1903 conveyance is similarly left without elucidation. The parties did not introduce contemporary instruments of conveyance or contracts, which might have demonstrated how the terms I must interpret were used at that time in that community. Nor did they produce other instruments or documents drawn by or involving the Fort Collins Development Railway Company, which might have shed light upon that entities' use of similar or dissimilar phrases to accomplish similar or dissimilar ends. I am given no evidence of the creation or history by that railroad of easements on neighboring lands. Finally, no contemporary correspondence or other colloquial communications appear in the record.

Other evidence that the Colorado courts have identified as relevant to my inquiry is unlikely to be available. For example, the habits and practices of Mr. Morrison and the Fort Collins Development Railway Company before and after the conveyance are shrouded in the dusk of unrecorded history. *Contrast*, *Lobato*, 71 P.3d at 948. It is doubtful that any general plan of development for the area existed in 1903. Nor are the parties here likely to discern the

consideration, if any, paid for the easements (or, more likely, the difference between the consideration the railroad paid to Morrison and what it would have paid but for the crossing reservation), the subjective intents of the persons involved in the transaction, or the other circumstances under which the conveyance was made. No evidence appears to suggest that the parties to the 1903 deed might have contemplated the possibility of storm water management or detention ponds.

Hartshorn argues that its planned uses for the crossings are not unreasonable, and therefore are permissible. In a vacuum, that might be true. However, I am operating not in a vacuum but rather within the confines of the 1903 deed. Hartshorn has provided no evidence that the parties to the 1903 deed – a farmer and a railroad operating in an agricultural community – could have contemplated, much less intended, use of the crossings to develop and access a residential development or construct and maintain a storm water detention pond. Rather, it is reasonable to conclude that Mr. Morrison's limited purposes – farming his land – facilitated the transaction because his use of the easement consistent with those ends had minimal effect upon the railroad. *See East Ridge of Fort Collins, LLC v. Larimer and Weld Irr. Co.*, 109 P.3d 969, 976 (Colo. 2005). I find and conclude that Hartshorn's proposed non-agricultural uses of the crossings exceed the scope of the easement that the parties created in 1903.

Furthermore, I find and conclude that Hartshorn's proposed uses of the crossings exceed the reasonable development of the easement's scope. Restatement Property § 484 cmt. a (1944); Restatement (Third) of Property (Servitudes) §§ 4.1, 4.10 (2000). Nothing in the evidence before me suggests that Mr. Morrison or the railroad contemplated or had reason to contemplate residential development or construction of a city's storm water detention pond on the northwest

parcel. *Thompson v. Whinnery*, 895 P.2d 537, 541-542 (Colo. 1995).

### B.     Duration of the reservation

BNSF recites that Morrison conveyed the trackage way to the railroad and "its successors, heirs and assigns" but that the railroad did not reciprocate. It argues that the lack of language reserving for Morrison's assigns the right to use the crossings demonstrates an intent that the reservation not run with the land. However, that Mr. Morrison intended his conveyance to descend to the railroad's assigns does not indicate that the railroad intended its conveyance to be personal to Mr. Morrison. Instead, lacking any express indication as to the nature of the easement, I resort to the default presumption that the parties created an easement appurtenant. *Lobato*, 71 P.3d at 945; *Lewitz v. Porath Family Trust*, 36 P.3d 120, 122 (Colo. App. 2001); *DR/CR Family, LLLP v. Burger*, 80 P.3d 948, 951 (Colo. App. 2003).

BNSF also points out that the crossing reservation in the 1903 deed does not use the words "easement," "ingress," or "egress." It asserts that the reservation was thus in gross. However, the reservation of the crossings was made not for any use personal to Mr. Morrison but rather expressly "for use on said farm." Therefore, I have no difficulty finding and concluding that the purpose of the reservation was to benefit the land and that the easement is appurtenant to the land and not in gross. *Lewitz*, 36 P.3d at 122-123.

### C.     Necessity

The 1903 conveyance does not specify the number of crossings that the railroad must maintain. Rather, it requires the railroad to install those crossings necessary for use on the property. Mr. Crumb testified that he can access the northwest parcel using one of the two crossings. Having two crossings facilitated excavation and made the parcel eligible for residential

development. However, as I have determined, those uses exceed the scope of the easement. The parties agreed at trial that the crossing nearest the bridge over the nearby canal provides the safest, most expedient access to the northwest parcel.

### D.     BNSF's other arguments

Conceding that no Colorado authority supports its assertion of privilege to remove the crossings, BNSF cites the Restatement (Second) of Torts §§ 197, 201 (1965). Those provisions concern affirmative defenses to Hartshorn's claim for trespass, which is not currently before me.

BNSF also argues that Hartshorn forfeited or abandoned the crossings because it used them for purposes other than those intended. It cites no authority supporting this proposition, and I find none. Instead, it cites *Bear Creek Development Corp. v. Genesee Foundation*, 919 P.2d 948, 954 (Colo. App. 1996), in which the court noted that ways of necessity are to be interpreted narrowly, persist only while required to accomplish the purpose of the condemnation, and are terminable upon a change of circumstance. The easement here, by contrast, arose out of an express grant.

BNSF cites dicta from the *Bear Creek* decision that ways of necessity "should not last any longer than would the comparable common law easement by necessity, or any other easement granted for a specific purpose." *Bear Creek Development Corp.*, 919 P.2d at 955. However, I find no evidence in support of BNSF's view that the easement here is limited to agricultural purposes. Rather, I have found only that Hartshorn's proposed use of the crossings exceeded what Morrison and the railroad intended and contemplated in 1903.

Accordingly, it is ORDERED, ADJUDGED, and DECLARED that:

1) Hartshorn's motion for an injunction is GRANTED to the extent that it seeks restoration of the crossing and gates nearest to the bridge over the nearby canal and DENIED to the extent that it seeks restoration of both crossings;

2) judgment shall enter on Hartshorn's behalf on its claims for injunctive and declaratory relief to the extent that Hartshorn seeks restoration of the crossing and gates nearest to the bridge over the nearby canal, and otherwise judgment shall enter on BNSF's behalf on these claims;

3) judgment shall enter on BNSF's behalf on its claim for injunctive relief to the extent that it seeks to prohibit Hartshorn from using the restored crossing to develop residential properties or a storm water retention pond on the northwest parcel, and otherwise judgment shall enter on Hartshorn's behalf on this claim.

Dated: December __12__, 2006, in Denver, Colorado.

BY THE COURT:

s/Lewis T. Babcock
Lewis T. Babcock, Chief Judge